**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**REBECCA E. BOWMAN,**

   **Plaintiff,**

**v.**          **Case No.: 2:13-cv-14114**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

   **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings. (ECF Nos. 12, 13).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,**

and removed from the docket of the Court.

## I.      Procedural History

On April 19, 2010, Plaintiff, Rebecca Eileen Bowman ("Claimant"), filed an application for DIB, alleging a disability onset date of August 11, 2008, due to lower back problems. (Tr. at 124, 165). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 76, 82). Claimant filed a request for an administrative hearing, (Tr. at 87), which was held on October 3, 2011 before the Honorable Thomas W. Springer, Administrative Law Judge ("ALJ"). (Tr. at 33-73). By written decision dated October 11, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 17-28). The ALJ's decision became the final decision of the Commissioner on January 31, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 7-9).

Pursuant to Claimant's request, the Appeals Council extended the time within which Claimant could file a civil action seeking court review, (Tr. at 1), and Claimant thereafter timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 8, 9), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 12, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.     Claimant's Background

Claimant was 38 years old at the time she filed the application for benefits, and 40 years old on the date of the ALJ's decision. (Tr. at 14, 124). She is a high school graduate and communicates in English. (Tr. at 42). Claimant has prior relevant work experience as a certified nursing assistant and a restorative nursing aide. (Tr. at 63).

III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a

*prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2013. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 11, 2008, the alleged onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar spine and congenital condition affecting the right hand." (Tr. at 19-20, Finding No. 3). The ALJ considered Claimant's other complaints and decided that her remaining impairments were either non-severe or not medically determined. (Tr. at 20).

Under the third inquiry, the ALJ found that Claimant did not have any impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20, Finding No. 4). Accordingly, he determined that Claimant possessed:

[T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except while she has unlimited use of the upper extremities for pushing and pulling, she has limited repetitive use of the right upper extremity. She is precluded from climbing ladders, ropes, or scaffolds. This individual can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to extreme cold, extreme heat, vibrations, and hazards. This individual is further limited to standing and walking for no more than 4 hours collectively and to sitting for 4 hours in an 8-hour workday. She must be allowed to alternate her posture as needed during the work period. In addition, she would have limited use of the lower extremities for operation of foot controls and for pushing and pulling, and requires the use of a hand-held assistive device with ambulation for long periods.

(Tr. at 21-27, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 27, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 27-28, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1971, and was defined as a younger individual; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 27, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 27-28, Finding No. 10), such as an information clerk, which is a sedentary job. (Tr. at 28). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 28, Finding No. 11).

## IV.   **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the ALJ's decision is unsupported by substantial evidence on record because (1) the ALJ improperly discounted the credibility of Claimant's

testimony, and (2) the ALJ improperly relied upon the vocational expert's testimony regarding work available to Claimant. (ECF No. 12 at 13-14). Claimant complains that the ALJ noted only part of her testimony in the decision, and failed to properly consider that Claimant "had no insurance at the time of her hearing." (*Id.* at 14-15). Claimant also insists that the ALJ "did not adequately inform the vocational expert of [her] limitations with regard to her right hand and wrist," (*Id.* at 15), and as a result the vocational expert's testimony was inconsistent with the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles. (*Id.* at 16).

In response, the Commissioner argues that the ALJ appropriately discounted Claimant's testimony in light of the objective medical evidence on record. (ECF No. 13 at 12-14). The Commissioner also argues that the ALJ adequately limited Claimant's hand functioning, pointing out that Claimant fails to identify any medically supported limitations in addition to those that were included in the RFC and relayed to the vocational expert. (*Id.* at 15-16). Furthermore, the Commissioner argues that the vocational expert's testimony was not inconsistent with the *Selected Characteristics of Occupations*. (*Id.* at 16).

## V.   Relevant Medical History

The undersigned has reviewed the evidence in its entirety, including all of the medical records and has summarizes the relevant records below.

### A.   Medical Treatment Records

On March 6, 2007, Claimant sought treatment for right wrist pain resulting from an injury she sustained several months prior at work. (Tr. at 251-52). Claimant complained of right wrist tenderness with flexion, extension, and hyperextension, and reported chronic weakness in her right grip. (Tr. at 251). X-ray results of Claimant's

6

right wrist revealed "dysraphic change noted involving the right wrist" as compared to her prior x-ray results dated 12/16/2006. (Tr. at 258). There was an observed "absence of the fourth metacarpal, likely congenital," the hamate bone was atrophic, and there was mild joint space loss involving the radiocarpal joint. (*Id.*). However, the appearance of Claimant's wrist was "unchanged when compared to the prior study" and "no acute fracture or dislocation" was evident. (*Id.*).

On August 11, 2008, Claimant was treated at Jackson General Hospital for a back injury she sustained that day while working as a nursing aide. (Tr. at 297-301). X-ray results of Claimant's lumbosacral spine revealed "13 mm of spondylolisthesis of L5 on S1 with associated moderate to severe degenerative disc disease," but "no compression fracture." (Tr. at 302).

On August 14, 2008, Claimant was treated at Morad/Hughes Health Center. Her physical examination revealed "facet SI tenderness with palpation" and a "slow-controlled gait," but was otherwise unremarkable. (Tr. at 246). Claimant was assessed with sciatica and lower back pain with radiculopathy. (*Id.*). Claimant was prescribed Darvocet, instructed to undergo an MRI, and given a work excuse through August 18, 2008. (Tr. at 246, 248). On August 20, 2008, Claimant's lumbar spine MRI revealed "Grade I anterior spondylolisthesis at L-5 and on S-1 with central disc protrusion but there [was] no evidence of disc herniation or high grade spinal stenosis at this level or any other visualized level." (Tr. at 256). There was also "moderate bilateral L5-S1 neural foramina encroachment right greater than left related to hypertrophic facet joint change" and "mild diffuse bulging discs at the L4-5 level." (*Id.*).

On August 22, 2008, Claimant's physical examination was essentially normal, but she was assessed with sciatica and chronic lower back pain with radiculopathy, and

referred to Dr. Schmidt for further evaluation and treatment options. (Tr. at 238, 244). The treating nurse practitioner noted that Claimant continued to have back pain radiating down her right leg. (Tr. at 245). She was issued a work excuse through August 27, 2008. (Tr. at 240).

Claimant received chiropractic adjustments approximately every other day between August 26, 2008 and September 19, 2008. (Tr. at 266-68). Claimant also received "manual therapy" from Dr. Bradley George concentrated at her "lumbar glutes" on a weekly basis between August 28, 2008 and October 30, 3008. (Tr. at 269-70, 275-79). On November 6, 2008, Claimant canceled her two remaining appointments, stating that she was going to another doctor. (Tr. at 275).

On October 16, 2008, Claimant sought emergency treatment from Jackson General Hospital with complaints of back spasms occurring three days prior, due to her recent work injury. (Tr. at 304). Claimant's physical examination revealed pain with range of motion, but was otherwise within normal limits. (*Id.*). Claimant was medicated for back pain and discharged later that day. (Tr. at 305).

On October 27, 2008, Claimant began receiving treatment from Michael Shramowiat, M.D. at Mountaineer Pain Relief and Rehabilitation Centers. (Tr. at 346). Claimant's physical examination revealed that her "straight leg raises produce[d] hamstring tightness" and she had "moderate muscle tightness in the lumbar paravertebral region and pain with lumbar range of motion." (Tr. at 347). She was assessed with lumbar radiculopathy, lumbar spondylolisthesis, and lumbar disc herniation with myelopathy. (*Id.*). Dr. Shramowiat prescribed pain medication, ordered electrodiagnostic studies of both lower extremities, and instructed Claimant to follow up in two weeks. (*Id.*). Dr. Shramowiat issued a work excuse through November 6, 2008,

8

after which Claimant could return to "a light duty desk job with no lifting and no overhead lifting." (Tr. at 347, 362). On October 29, 2008, Claimant's lumbar spine x-ray revealed "Grade II spondylolisthesis of L-5 on S-1 with slight accentuation on flexion imaging" as well as "moderate degenerative disc disease at L-5 –S-1" but "no compression fracture." (Tr. at 294).

On November 11, 2008, Claimant attended a follow-up appointment. (Tr. at 344). Claimant's physical examination revealed diminished sensation on the medial aspect of her right lower leg, and her right straight leg raise was positive. (*Id.*). Dr. Shramowiat refilled Claimant's pain medication prescription, instructed her to continue and complete physical therapy, and to follow up in one month. (*Id.*). Throughout November 2008, Claimant received physical therapy at Jackson General Hospital on eight occasions, after which she was discharged pursuant to her report that her physician wanted her to stop PT until after surgery. (Tr. at 289-92).

On December 4, 2008, Dr. Shramowiat conducted an EMG and nerve conduction study, which was within normal limits. (Tr. at 345). Claimant was noted to have completed physical therapy, and was instructed to follow up in two months. (Tr. at 345).

On February 4, 2009, Claimant was treated by Dr. Shramowiat with continued complaints of lower back pain. (Tr. at 343). Claimant's straight leg raises were positive in the right lower extremity, she had moderate to severe muscle tightness in the lumbar paravertebral region bilaterally, pain with lumbar range of motion, and "still ha[d] numerous palpable tender points and trigger points in the lower lumbar region." (*Id.*). Dr. Shramowiat prescribed pain medication, opined that Claimant would "require surgical intervention at some point in the future," and instructed her to follow up in two months. (*Id.*).

Claimant attended monthly follow-up appointments from April 1, 2009 through July 1, 2009, throughout which she continued to experience lower back pain and numbness. (Tr. at 338-42). On April 1, 2009, Claimant received two right lower lumbar trigger point injections. (Tr. at 342). Her physical examinations consistently yielded diminished sensation on her right thigh, right lumbar paraspinal tenderness and tightness, and a positive straight leg test on the right, with instructions to follow up in one month. (*Id.*).

On August 24, 2009, Claimant was referred to John H. Schmidt, III, M.D. for a neurological examination. (Tr. at 261-64). Claimant described her pain as "stabbing and sharp" and reported that it was exacerbated by standing or walking, going up or down stairs, or lying on her right side, while it improved when lying flat on her back with her legs elevated. (Tr. at 264). Claimant's physical examination was essentially normal, except that "straight leg raise [was] accomplished at 80 degrees on the right with limitation due to the hip and leg pain on the right and reproduction with right hip and leg pain." (Tr. at 263). Claimant was assessed with L5-S1 spondylolisthesis, lumbosacral radiculopathy, and HNP at right L5-S1. (*Id.*). Dr. Schmidt discussed the possibility of corrective surgery, but ultimately recommended that Claimant "should continue conservative efforts, as she does appear to be improving somewhat." (Tr. at 264). Dr. Schmidt recommended continuing her current treatment for another six months before further consideration of surgery, but instructed to follow up in six months if her condition did not improve, to discuss again her options. (*Id.*).

On November 17, 2009, Claimant attended a follow up appointment with Dr. Shramowiat. (Tr. at 358). Claimant's physical examination revealed "paresthesias on the medial aspect of the right lower extremity," lumbar paraspinal tenderness and tightness,

and her straight leg raise was mildly positive on the right. (*Id.*). Dr. Shramowiat noted that "workers' comp ha[d] denied neurosurgery with Dr. Schmidt as had been recommended" and therefore referred her to Dr. Schmidt "per regular insurance." (*Id.*). Claimant's pain medication was renewed, and she was instructed to follow up in two months. (Tr. at *Id.*).

On February 2, 2010, Claimant attended a follow-up appointment with continued complaints of low back pain, as well as "pain and numbness in the right lower extremity." (Tr. at 359). Her physical examination revealed "some paresthesias in the right lower extremity L5 nerve root distribution," positive right straight leg raise, and "moderate to severe muscle tightness in the lumbar paravertebral region." (*Id.*). Claimant had not yet seen Dr. Schmidt, and was again instructed to follow up with Dr. Schmidt. (*Id.*). Claimant's pain medication was renewed, and she was instructed to follow up in two months. (*Id.*).

On May 10, 2010, Claimant sought emergency treatment at Jackson General Hospital with complaints of back and hip pain due to slipping on wet grass two days prior. (Tr. at 420). Treatment notes indicate that Claimant had received injections from Dr. Shramowiat in February, but "stopped seeing [him] due to improvement." (*Id.*). Claimant was assessed with acute low back strain and chronic back pain, prescribed pain medication, and discharged later that day. (Tr. at 421-24).

On August 3, 2010, Claimant sought emergency treatment with complaints of left hip pain. (Tr. at 410). X-ray results of Claimant's lumbosacral spine revealed "Grade I anterior spondylolisthesis of L5 on S1" and "multi-level degenerative disc change with no acute fracture." (Tr. at 415). X-ray results of Claimant's left hip revealed "no acute fracture or dislocation." (*Id.*). Claimant was assessed with acute low back pain and left

leg sciatica. (Tr. at 413). She was prescribed pain medication and discharged in stable condition with instructions to follow up with Dr. Shramowiat. (Tr. at 411-13, 416-17).

On May 13, 2011, Claimant sought emergency treatment with complaints of chest discomfort and swollen hands and feet over the past 13 hours. (Tr. at 381-85). Claimant's physical exam was unremarkable, and her chest x-ray results revealed no acute infiltrate. (Tr. at 377-79, 396). However, Claimant tested positive for Helicobacter Pylori. (Tr. at 376). Claimant was discharged the following that day, with instructions to schedule an outpatient cardiac stress test later that week. (*Id.*).

### B.    Evaluations and Opinions

On January 14, 2009, Claimant was evaluated by Bruce A. Guberman, M.D. at Tri-State Occupational Medicine. (Tr. at 313-18). Claimant relayed the history of her back injury, (Tr. at 313-14), and reported experiencing "intermittent sharp to dull low back pain occurring every day" which "radiates into the right hip and the posterior aspect of the right leg to the right   knee." (Tr. at 314). Claimant also reported experiencing periodic sharp pain, as well as weakness and instability in her right leg, which was exacerbated at times by bending, stooping, and lifting. (*Id.*). Claimant stated that her lower back pain was exacerbated by prolonged sitting, standing, and walking for long distances, as well as by coughing and riding in a vehicle, and that it was improved by moving around and changing positions. (Tr. at 314-15).

Claimant was observed to have an antalgic gait but was steady, and appeared uncomfortable in the supine and sitting position. (Tr. at 316). Her physical examination was essentially normal, except that her lumbar spine revealed moderate tenderness and no spasm, her range of motion was slightly decreased, and her Achilles and patellar tendon reflexes were graded 1/4 bilaterally. (Tr. at 316-17). Claimant was assessed with

"acute and chronic lumbosacral strain, post-traumatic" and "pre-existing spondylolisthesis." (Tr. at 317). Dr. Guberman noted that since her work accident, Claimant's "symptoms have improved but not resolved with conservative treatment" and that there were "range of motion abnormalities on examination of the lumbar spine." (*Id.*). Dr. Guberman observed "a slight decrease in all deep tendon reflexes, but there [was] no other evidence of radiculopathy on examination." (*Id.*). Dr. Guberman also found "range of motion abnormalities on examination of the lumbar spine" but noted that "at least in part these are related to pain" and that Claimant did not meet the validity criteria in the American Medical Association's Guides to the Evaluation of Permanent Impairment. (*Id.*). Dr. Guberman opined that Claimant had "reached maximum medical improvement in regards to the injury of August 11, 2008" and therefore recommended "no further specific treatment and/or diagnostic testing" with regard to her injury. (Tr. at 318). Dr. Guberman also recommended that Claimant "undergo a functional capacity evaluation with return to work with limitations obtained from the functional capacity evaluation." (*Id.*).

On September 21, 2009, consultative physician James Egnor, M.D. provided a Physical RFC Opinion regarding Claimant's functional limitations. (Tr. 329-36). Dr. Egnor opined that Claimant was capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, could stand and/or walk with normal breaks for 6 hours in an 8 hour workday, could sit with normal breaks for 6 hours in an 8 hour workday, and was unlimited in her ability to push and/or pull. (Tr. at 330). Regarding postural limitations, Dr. Egnor opined that Claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. at 331). Regarding environmental limitations, Dr. Egnor recommended that Claimant avoid concentrated exposure to extreme cold and vibration, noting

Claimant's chronic pain as rationale for applying such limitations. (Tr. at 333). Otherwise, Dr. Egnor opined that Claimant could withstand unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, as well as hazards such as machinery and heights. (*Id.*). Dr. Egnor regarded Claimant's complaints as "partly credible" and opined that Claimant's RFC was "reduced to do only light work with some postural and environmental limitations as noted." (Tr. at 336).

On June 12, 2010, consultative physician Fulvio Franyutti, M.D. provided a Physical RFC Opinion regarding Claimant's functional limitations. (Tr. 364-71). Dr. Franyutti opined that Claimant was capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, could stand and/or walk with normal breaks for 6 hours in an 8 hour workday, could sit with normal breaks for 6 hours in an 8 hour workday, and was unlimited in her ability to push and/or pull. (Tr. at 365). Regarding postural limitations, Dr. Franyutti opined that Claimant could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 366). Regarding environmental limitations, Dr. Franyutti recommended that Claimant avoid concentrated exposure to extreme cold, extreme heat, vibration and hazards, but that she could withstand unlimited exposure to wetness, humidity, noise, and irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. at 368). Otherwise, Dr. Franyutti opined that Claimant could withstand unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, as well as hazards such as machinery and heights. (*Id.*). Dr. Franyutti observed that Claimant's limitations "appear exaggerated and partially supported by findings" and that Claimant's statement was only partially credible. (Tr. at 369). In support of his opinion, Dr. Franyutti noted that Claimant's lower extremity strength was reported as

14

5/5 and that she uses a cane. (*Id.*). Dr. Franyutti observed that "information is vague about the lower extremities, except for paresthesia, and able to walk 10-15 feet." (*Id.*).

On August 11, 2010, consultative physician Atiya M. Lateef, M.D. provided a case analysis, in which she affirmed Dr. Franyutti's Physical RFC opinion. (Tr. at 373). Dr. Lateef observed that Claimant's "physical RFC appears alright at light RFC." (*Id.*).

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

### A.  Assessment of Claimant's Credibility

Claimant argues that the ALJ's RFC assessment is unsupported by substantial evidence because the ALJ improperly assessed Claimant's credibility. (ECF No. 12 at 13-15).  According to Claimant, the ALJ "noted only part of her testimony in his decision," in that he ignored the physical limitations to her ADL's and "neglected to mention that [Claimant] had no insurance at the time of her hearing" and was therefore unable to seek ongoing medical treatment. (*Id.* at 14-15).

Pursuant to the Regulations, the ALJ evaluates a claimant's report of symptoms using a two-step process. 20 C.F.R. § 404.1529. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 404.1529(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence or

16

severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit Court of Appeals stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations. . . for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to

18

determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided an overview of Claimant's testimony, (Tr. at 21), which he then compared to the relevant medical evidence and consultative evaluations in order to assess Claimant's credibility. (Tr. at 22-27). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms she alleged, but that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 21). The ALJ observed that Claimant's claims of disabling symptoms were inconsistent with her continued activities of daily living, which included doing dishes, cooking, sorting and folding laundry, using a computer, and painting as a hobby, (Tr. at 25, 47-49, 54), as well as the fact that she apparently stopped receiving treatment from Dr. Shramowiat following her improvement in February 2010. (Tr. at 24).

Claimant objects to both rationales for discounting her credibility, countering that (1) the ALJ ignored her full testimony regarding her ADL's, namely that she does the dishes while sitting on a stool, and that her husband does the cooking, and (2) the ALJ failed to consider Claimant's testimony that she had ceased treatment with Dr. Shramowiat and Dr. Schmidt because her "workers' compensation carrier had refused to authorize continued treatment." (*Id.* at 14-15). Neither objection renders the ALJ's opinion unsupported by substantial evidence. First, at the hearing, Claimant testified that when she does the dishes she sits on a barstool, and that "[o]n Sundays, me and my husband, he'll help me cook and we'll do big meals and make them up and freeze them for dinner during the week. So when I'll sit on the barstool and chop up the vegetables

or stuff, and he'll do the standing over the stove. . ." (Tr. at 48). The fact that Claimant requires a barstool for sitting or that her husband assists her at the stove does not diminish the ALJ's overall observation that "[d]espite her impairment, the claimant has engaged in a somewhat normal level of daily activity and interaction" and that "[s]ome of the physical abilities required in order to perform these activities are the same as those necessary for obtaining and maintaining employment." (Tr. at 25). Notwithstanding Claimant's qualifying statements, the ALJ appropriately determined that her description of ADL's undermined the credibility of her allegations of disabling functional limitations. (*Id.*).

Second, although Claimant testified that her Workers' Compensation insurance refused to authorize continued treatment by Dr. Shramowiat or Dr. Schmidt, (Tr. at 44-45, 51), the record contains conflicting medical treatment notes that Claimant ceased treatment with Dr. Shramowiat in February 2010 due to improvement. (Tr. at 420). Even assuming the ALJ erred in crediting the medical records over Claimant's testimony, such error would have been harmless, as the ALJ also noted that Claimant received only routine conservative treatment while under Dr. Shramowiat's care in the first place, and that limited objective clinical and diagnostic findings did not support more restrictive functional limitations than those contained in her RFC assessment. (Tr. at 25). Based upon the medical evidence on record, all three state agency consultative physicians opined that Claimant was capable of performing light work subject to certain postural and environmental limitations. (Tr. at 313-18, 364-71, 373). Moreover, although the ALJ accorded significant weight to the consultative physician's RFC opinions, the ALJ specifically gave Claimant "the great benefit of the doubt," by also including "limitations for leg pain and difficulties" based upon her testimony, despite

"being aware of the scarcity of abnormal findings in the medical evidence of record." (Tr. at 24). Claimant's RFC therefore reflects greater functional limitation than the medical evidence supports, and at any rate adequately accounts for Claimant's testimony as to her activities of daily living.

A review of the written decision confirms that the ALJ performed a thorough analysis of the evidence and carefully weighed Claimant's statements against the objective medical findings, medical source opinions, activities of daily living, and other evidence in the record. He then explained his reasons for discounting Claimant's allegations regarding the disabling effects of her impairments, pointing to specific pieces of evidence that he felt diminished Claimant's credibility. Clearly, the ALJ complied with the two-step process and provided a reasonable explanation. Consequently, the undersigned **RECOMMENDS** that the District Court **FIND** that the ALJ followed the proper agency procedures in assessing Claimant's credibility and weighing medical source opinions; and further recommends that the District Court **FIND** that the ALJ's RFC assessment is supported by substantial evidence on record.

### B. Vocational Expert Testimony

Claimant argues that the ALJ "did not adequately inform the vocational expert of [her] limitations with regard to her right hand and wrist." (ECF No. 12 at 15). Specifically, Claimant contends that the ALJ's hypothetical involving an individual with "limited repetitive use of the right upper extremity" was too vague in that it failed to clarify "how frequently during a work day" the individual could use her right hand. (*Id.* at 16). As a result, the vocational expert's testimony that an individual with those limitations could work as an information clerk was inconsistent with the job description contained in the *Selected Characteristics of Occupations Defined in the Revised*

*Dictionary of Occupational Titles ("SCO")*.[1] (ECF No. 12 at 16). Accordingly, Claimant argues that the ALJ's determination that Claimant could perform work as an information clerk, a job which exists in the national and regional economy in sufficient numbers, is unsupported by substantial evidence. (ECF No. 12 at 17).

At the fifth and final step of the sequential evaluation, the ALJ must determine if the claimant is capable of performing work that exists in sufficient numbers in the national economy. 20 C.F.R. § 404.1520(g). In doing so, the ALJ "will take administrative notice of reliable job information available from various governmental and other publications" including the *Dictionary of Occupational Titles ("DOT")*. 20 C.F.R. § 404.1566(d)(1). The ALJ may also rely upon vocation experts to determine if the claimant is capable of performing work that exists in the national economy. *Id.* § 404.1566(e).

In order for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989); *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). To frame a proper hypothetical question, the ALJ must first translate the claimant's physical and mental impairments into a RFC that is supported by the evidence; one which adequately reflects the limitations imposed by the claimant's impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006). "[I]t is the claimant's functional capacity, not his clinical impairments, that the ALJ must relate to the vocational expert." *Fisher v. Barnhart,* 181 F. App'x 359, 364 (4th Cir. 2006). A

---

[1] The *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* is a supplemental publication by the Department of Labor, intended to provide "more detailed occupational data than that contained in the *Revised Fourth Edition Dictionary of Occupational Titles.*" U.S. Dep't of Labor, Foreword to *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, at v (1993).

hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence." *Id.* (citing *Johnson v. Barnhart,* 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted). However, "[t]he Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities." *Morgan*, 142 F. App'x at 720-21.

Furthermore, Social Security Ruling 00-4p requires that "[w]hen a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert] evidence and information provided in the DOT." SSR 00-4p, 2000 WL 1898704, at *4 (S.S.A. 2000). In order to satisfy this duty, the ALJ must "ask the [vocational expert] if the evidence he or she has provided conflicts with information provided in the DOT; and if the [vocational expert's] evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict." *Id.* The ALJ must then "resolve this conflict before relying on the [vocational expert] evidence to support a determination or decision that the individual is or is not disabled." *Id.* The ALJ is further instructed to "explain in the determination or decision how he or she resolved the conflict" and to "explain the resolution of the conflict irrespective of how the conflict was identified." *Id.* However, the ALJ need only address apparent discrepancies between a vocational expert's testimony and the Dictionary of Occupational Titles, there being no obligation on the ALJ to uncover such discrepancies in light of the vocational expert's testimony. *See Justin v. Massanari*, 20 F. App'x 158, 160 (4th Cir. 2001) (citing SSR 00-4p, at *2); *Michel v. Commissioner*, No. SAG-13-

2311, 2014 WL 2565900, at *5 (D. Md. Jun. 5, 2014); *see also Martin v. Commissioner*, 170 F. App'x 369, 374 (6th Cir. 2006) (holding that "[n]othing in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct"). While a claimant may bring a vocational expert's mistake to the ALJ's attention, courts in this and other districts have cautioned that "claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000); *see also Bentley v. Commissioner*, Civil Action No. 1:13CV163, 2014 WL 906587, at *15 (N.D.W.Va. Mar. 7, 2014); *Carson v. Colvin*, No. 1:12-CV-262, 2014 WL 253537, at *9 (W.D.N.C. Jan. 23, 2014); *Mosteller v. Astrue*, No. 5:08-CV-003-RLV-DCK, 2010 WL 5317335, at *5 (W.D.N.C. Jul. 26, 2010) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002)). Thus, "[o]nce the ALJ fulfills its 'affirmative responsibility' to inquire about possible conflicts and, if necessary, resolve reasonably explained conflicts, the ALJ may accept the VE's testimony in its consideration of whether there is substantial evidence of disability. *Stuckey v. Colvin*, Civil Action No. 2:12-cv-386, 2013 WL 6185837, at *3 (E.D.Va. Nov. 25, 2013).

In the instant case, the ALJ presented the vocational expert with a series of hypothetical questions involving an individual similarly situated to Claimant. (Tr. at 65-67). In the third and fourth hypotheticals, the ALJ restricted the individual to "limited repetitive use of the right upper extremity," among other limitations, consistent with Claimant's ultimate RFC determination. (Tr. at 67).  The vocational expert testified that

an individual with Claimant's age, education, work experience, and RFC would be capable of working as an information clerk (DOT 237.367-022), there being approximately 61,000 such positions in the national economy and 4,000 in the tri-state region. (Tr. at 66-67). At the conclusion of his inquiry, the ALJ asked the vocational expert if his testimony was consistent with the DOT, to which the vocational expert responded affirmatively. (Tr. at 68). Subsequently, Claimant's counsel posed several additional hypotheticals, one of which also included the restriction of "limiting the repetitive use of the upper extremity." (Tr. at 69). At no time did Claimant's counsel call attention to any potential conflict between the vocational expert's testimony and either the DOT or the SCO.

Therefore, the ALJ fulfilled his duty to inquire about possible conflicts by explicitly asking the vocational expert if his opinions were consistent with the DOT. When the ALJ received an affirmative answer, he had no further duty to investigate the matter in the absence of an apparent conflict. Certainly, Claimant brought no such conflict to the attention of the ALJ at the time of the hearing, when it could have been addressed and resolved. To the extent Claimant now argues that the ALJ erred in failing to discern an apparent conflict, her claim is unavailing. The ALJ was entitled to rely upon the vocational expert's testimony. *See French v. Colvin*, No. 7:12-CV-297-FL, 2014 WL 1331042, at*13 (E.D.N.C. Feb. 24, 2014) ("Claimant's speculation that the ALJ's visual limitation would preclude the jobs listed by the VE is insufficient to show error, particularly where Claimant's counsel questioned the VE regarding his opinion, but failed to inquire regarding the visual limitation and alleged conflict between the visual limitation imposed by the ALJ and the jobs listed by the VE.").

Additionally, it is evident that the vocational expert's testimony in this case does not conflict with the DOT or the SCO. Under the SCO, an information clerk is characterized as requiring sedentary exertional level, with occasional reaching and handling; frequent talking, hearing, and near acuity; and a moderate noise intensity level. SCO at 336. An "occasional" activity or condition "exists up to 1/3 of the time," while a "frequent" activity or condition "exists from 1/2 to 2/3 of the time." SCO at ID-2. Claimant argues that the ALJ's failure to define the degree of "limited repetitive use" of the right extremity renders the decision void as "the Court cannot tell whether the job of information clerk is available to [Claimant]" in light of the reaching and handling requirements. (ECF No. 12 at 17). The undersigned disagrees with this contention for three reasons. First, the record substantially supports the finding that Claimant is capable of reaching and handling at least one third of an eight-hour work day. Second, the vocational expert was aware of Claimant's record; therefore, he was not confused by the differences between Claimant's ability to reach, handle, and use her right hand for repetitive motions. Third, even assuming that the ALJ found Claimant to be "severely limited" in the repetitive use of her right upper extremity, such that she could not do more than a few repetitive motions with her right hand within a period of one hour, the vocational expert's opinion that Claimant was capable of performing a job requiring occasional reaching and handling is not inconsistent with Claimant's RFC. Thus, the underlying premise of Claimant's argument is faulty.

Although Claimant suffers from a congenital malformation of her right hand and wrist, (Tr. at 45), the only medical evidence on record specifically relating to her right hand and wrist is dated over one year prior to her alleged disability onset date, (Tr. at 251-52, 258), and there are no objective medical findings or medical source statements

indicating that Claimant is incapable of occasional reaching and handling. Similarly, while Claimant testified that her right wrist and hand are weaker than her left, she has never alleged that the malformation significantly limits her ability to reach and handle. To the contrary, Claimant testified that she learned ways to compensate for the malformation, either by changing how she used the affected hand, or by simply using the other hand. Indeed, when asked to list all of the illnesses, injuries, or conditions that limit her ability to work, Claimant initially did not include her hand and wrist malformation. (Tr. at 165). After Claimant added her hand and wrist malformation to the list of alleged disabling impairments, she admitted to engaging in daily activities that unquestionably require occasional reaching and handling; such as sewing, painting, reading, doing laundry, talking on the telephone, dusting, cooking, making beds, and shopping, (Tr. at 54-55, 191-93). The vocational expert had access to Claimant's file and reviewed these documents prior to the administrative hearing. (Tr. at 62). Therefore, the expert was familiar with Claimant's activities and vocational background, including the work activities she had mastered despite her congenital malformation. (*Id.*).

Moreover, at the administrative hearing, the ALJ specifically solicited testimony regarding Claimant's hand limitations, allowing Claimant to describe the physical defect involving her right hand, the number of corrective surgeries she underwent as a child, and the "work-arounds" she developed over time that allowed her to perform basic work activities, such as those she performed as a certified nursing assistant and restorative nursing aide. (Tr. at 40-41, 45-47). Claimant testified that she can write, although she has to take breaks when writing long documents, and has done so all of her life. (Tr. at 40). She testified that in the past, she has made other adjustments, such as lifting with her left hand, (Tr. at 41), learning to hold pens differently, (Tr. at 46), and typing with

27

her left hand. (Tr. at 47). She also testified to using a supportive brace at work when her hand hurts. (*Id.*). Put in the context of Claimant's testimony, which occurred in the presence of the vocational expert, and the vocational expert's prior review of Claimant's file, the ALJ's restriction to "limited repetitive use of the right upper extremity" was not unduly vague. As a result, when the vocational expert testified that "all light-duty positions would be eliminated, [but] sedentary [positions] would remain," including the position of an information clerk, his opinion was based upon specific knowledge of the nature and extent of Claimant's impairments, including her hand limitation. (Tr. at 67).

At any rate, Claimant's presumption that a limitation on the repetitive use of her right hand may be intrinsically inconsistent with a job that requires reaching and handling is not logically supportable. *See Harrington v. Astrue,* Case No. 1:06-CV-936, 2008 WL 819035, at *5 (Mar. 21, 2008 M.D.N.C.) ("Although it does not define the term 'repetitive,' it is clear that the DOT does not use this term to describe 'physical demand' as it does the terms occasionally, frequently, and constantly... The DOT uses the term 'repetitive' when describing the 'temperament' of a job ... Clearly, it is possible to do something repeatedly without doing it a set fraction of the time."); *see, also, Stark v. Astrue,* 462 F.App'x 756, 756-57 (9th Cir. 2011) ("The ability to engage in frequent reaching and handling is not clearly inconsistent with the inability to engage in excessive or repetitive use of the hands"). As these cases point out, a measurement of the inability to engage in repetitive motion does not directly correlate with a measurement of the physical demand on an extremity. Consequently, Claimant's premise that the ALJ's failure to specify the severity of her limitation in regard to the repetitive use of her right hand automatically casts doubt on her ability to perform the job duties of an information clerk lacks a factual and legal basis. Contrary to Claimant's contention, the

28

vocational expert's opinions do not conflict with the DOT or the functional requirements of an information clerk, including occasional reaching and handling, as described in the SCO.

Accordingly, the undersigned **RECOMMENDS** that the District Court **FIND** that the ALJ did not err in relying on the vocational expert's testimony to determine that Claimant can perform work that exists in the national economy.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 12), **GRANT** Defendant's motion for judgment on the pleadings as articulated in the Commissioner's brief, (ECF No. 13), **DISMISS** this action, **with prejudice,** and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  August 5, 2014.

Cheryl A. Eifert
United States Magistrate Judge